UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| LISA M. VERMIGLIO and THERESA ANDREWS, | ) ) ) |
| Plaintiffs, | ) ) |
| vs. | ) Case number 4:07cv0282 TCM ) |
| GROUP HEALTH PLAN, INC., | ) ) |
| Defendant. | ) |

# MEMORANDUM AND ORDER

This action is before the Court on cross-motions by the parties for summary judgment on the question of the applicability of a state co-payment regulation to prescription drugs [Docs. 47, 48]; on the parties's cross-motions for summary judgment on the question when a determination must be made of whether there has been an excessive copayment [Docs. 77, 91]; and on a motion to strike, a motion for leave to file supplemental authority, and a motion for class certification [Docs. 73, 80, 87].

## Background

Plaintiff Lisa Vermiglio (Vermiglio) is an enrollee in a group health plan (the "Plan") administered by defendant Group Health Plan, Inc. ("GHP"), a health maintenance organization ("HMO"). The Plan defines "Basic Health Services" as "health care services which a Plan Member reasonably requires in order to be maintained in good health, including, as a minimum, inpatient Hospital, Physician, outpatient, and Emergency Health Services." (Pls. Ex. 1 at 8.) "Health Services" are "the health care services and supplies Covered under the Benefit Agreement, except to the extent that such health care services and supplies are

limited or excluded under the Benefit Agreement." (Id. at 14.) A Rider is "any attached description of Health Services Covered under the Benefit Agreement." (Id. at 18.) Chiropractic services are covered only through a Rider. (Id. at 60.) Prescription medications are also covered only through a Rider. (Id. at 66.)

A Schedule of Benefits is part of the Plan. (Id. at 77-78.) The schedule lists the copays for benefits covered by Riders and includes the reference, "See Rider." (Id. at 78.) Chiropractic care copays are $15 per visit. (Id.) "See Rider" is listed for formulary prescription drugs[1] and for non-formulary prescription drugs. (Id.) A copayment is a charge that, in addition to the premium, a Plan Member must pay for certain health services. (Id. at 8.) A copayment "for a single Health Service will not exceed fifty percent (50%) of the Plan's cost of providing that single Health Service, nor in the aggregate more than twenty percent (20%) of the total cost of providing all Basic Health Services." (Id.) "The total amount a Plan Member pays in Copayments is subject to an Annual Out of Pocket Maximum . . . which will not exceed two hundred percent (200%) of the total annual Premium." (Id.)

The Prescription Drug Rider provides that "all definitions, provisions, terms, limitations, exclusions, and conditions of the [GHP Certificate of Coverage] apply to this rider *except* to the extent such terms and conditions are explicitly superceded or modified by this Rider." (Id. at 79 (emphasis added)). The Rider applies to outpatient prescription drugs only. (Id. at 80.) The Rider also sets forth a tiered structure for determining the amount of the copay, ranging from $10 for a generic covered drug to $25 for a brand name covered drug to

---

[1]The Plan defines a "Drug Formulary" as "a listing of Prescription Medications which are approved for use by the Plan and which will be dispensed through Participating Pharmacies to Plan Members." (Id. at 10.)

$40 for a non-formulary drug. (Id. at 80.) The quantity of the drug dispensed upon payment of a single copayment is limited to a monthly supply. (Id. at 81.) If the Plan Member wishes to obtain a ninety day supply of a maintenance drug from a GHP-designated mail order provider or from a pharmacy qualified as a maintenance pharmacy, he or she can do so upon payment of an amount equal to two copayments. (Id.) If the Plan Member wants a ninety day supply from "any other GHP participating pharmacy," the member has to pay a copayment of 50%. (Id.)

> The Plan further provides that:
>
> If a Plan Member believes he is being erroneously assessed Copayments subsequent to satisfying his/her Annual Out-of-Pocket Maximum, the Plan requests that the Plan Member notify the Plan in writing. The Plan will reimburse the Plan Member for any Copayments in excess of the annual Out-of-Pocket Maximum limits stated in the Schedule of Benefits, if the Plan Member provides proof (satisfactory to the Plan) that excess Copayments have been paid no later than ninety (90) days after the end of the calendar year. However, failure to provide proof within the ninety (90) day period shall not invalidated or reduce the reimbursement, if it was not reasonably possible to provide notice or proof within the ninety (90) days. Reimbursement will not be denied based upon the Plan Member's failure to submit proof within the ninety (90) day period unless the failure operates to prejudice the rights of the Plan.

(Id. at 42.)

Vermiglio and her family (husband and two children) have prescriptions filled at either Walgreens or WalMart. (Pls. Stat.[2] ¶ 4.) "The co-pay on such prescription medication sometimes exceeded 50% of the cost of such medication." (Id. ¶ 5.)

---

[2]"Stat." refers to a party's Statement of Material Facts which are either undisputed or established by the evidence.

Plaintiffs argue that Missouri law prohibits copayments in excess of 50% of the cost of prescription drugs. GHP disagrees.

Vermiglio and plaintiff Theresa Andrews ("Andrews") have made a copayment for health care services in excess of the 50% rule and have later been reimbursed for the excess amount. (Def. Stat. ¶¶ 9, 10.) GHP refunds copayments made in excess of the 50% rule[3] on a quarterly basis. (Def. Stat. ¶ 9, Ex. A at 1.) This is so because "GHP's computer system will not allow it to automatically adjust copayments at the point of service." (Def. Stat. ¶¶ 9, 15, 16.) Any refund checks sent to members that are returned to GHP are sent to the State. (Pls. Ex. P at 23-24.)

GHP argues that it is permissible under 20 Mo. Code Regs. § 400-7.100 for an insured to pay more than 50% of the total cost of a single service at the point of service and then later be refunded any monies, plus interest, in excess of 50%. Plaintiffs disagree.

## **Discussion**

Summary Judgment Standard. "Rule 56(c) [of the Federal Rules of Civil Procedure] 'mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" **Erenberg v. Methodist Hosp.**, 357 F.3d 787, 791 (8th Cir. 2004) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986)). When ruling on a motion for summary judgment, "[t]he court must simply determine whether there exists a genuine issue for trial, i.e., whether there

---

[3]Presumably the reimbursement of excess amounts does not relate to copays on prescription drugs.

is sufficient evidence favoring the non-moving party for a jury to return a verdict in her favor." **Buboltz v. Residential Advantages, Inc.**, 523 F.3d 864, 870-71 (8th Cir. 2008). "The court must not weigh evidence or make credibility determinations, as those are functions for the jury." **Id.** Moreover, the facts must be viewed in the light most favorable to the nonmoving party and that party must be given the benefit of all reasonable inferences that can be drawn from the facts. **Matsushita Elec. Indus. Co. v. Zenith Radio Corp.**, 475 U.S. 574, 587 (1986). "Where, as here, the [pending] issues are primarily legal, rather than factual, summary judgment is particularly appropriate." **Jankovitz v. Des Moines Indep. Comty. Sch. Dist.**, 421 F.3d 649, 653 (8th Cir. 2005).

Excessive Copayment. As noted above, the first issue is whether Missouri's copay regulation applies to GHP's pharmaceutical drugs rider. The regulation reads:

> A[n] [HMO] may require copayments of its enrollees as a condition of the receipt of specific health care services. An HMO may not impose copayment charges that exceed fifty percent (50%) of the total cost of providing any *single service* to its enrollees, nor in the aggregate more than twenty percent (20%) of the total cost of providing all basic health services. An HMO may not impose copayment charges for *basic health care services* on any enrollee in any calendar year after the copayments made by the enrollee in that calendar year for *basic health care services* total two hundred percent (200%) of the total annual premium which is required to be paid by, or on behalf of, that enrollee and shall be stated as a dollar amount in the group contracts. Copayments shall be the only allowable charge, other than premiums, assessed to enrollees for basic and supplemental health care services. Single service copayment amounts shall be disclosed either as a percentage or as a stated dollar amount in the evidence of coverage. . . .

20 Mo. Code Regs. § 400-7.100 (emphasis added). The purpose of this rule is described as "stat[ing] that an [HMO] may require copayments of its enrollees as a condition for the

receipt of health care services." Id. It is promulgated pursuant to Mo. Rev. Stat. §§ 354.430 and 354.485. Id.

Chapter 354 of the Missouri Revised Statutes governs HMOs. Section 354.400(10) defines an HMO as "any person which undertakes to provide or arrange for basic and supplemental health *care* services to enrollees on a prepaid basis, or which meets the requirements of section 1301 of the United States Public Health Service Act." Section 1301 is codified, in part, at 42 U.S.C. §§ 300e, 300e-1. Section 300e(a) defines an HMO as "an entity organized under the laws of any State that provides "basic and supplemental health services to its members . . . ." "[B]asic health service[s]" includes eight categories of services, including, inter alia, medically necessary emergency health services, home health services, and preventive health services. 42 U.S.C. § 300e-1(1). "'[S]upplemental health services' means any health service which is not included as a basic health service . . . ." 42 U.S.C. § 300e-1( 2). Additionally, federal regulations require that an HMO "provide or arrange for the provision of basic health services to its enrollees as needed." 42 C.F.R. § 417.101. The eight categories of basic health services are those listed in the statute, § 300e-1(1)(a). Section 417.201(d) also lists sixteen categories that are *not* required to be provided as basic health services, including "[p]rescribed drugs and medicines incidental to outpatient care." None of the sixteen are included in the eight categories that are defined in § 300e-1(1) as basic health services. Also, federal regulations require that "[a]n HMO may not impose copayment charges that exceed 50 percent of the total cost of providing any single service to its members, nor in the aggregate more than 20 percent of the total cost of providing all basic health services." 42 C.F.R. § 110.105(a)(4)(i).

Missouri does not define basic health services. Rather, it defines "health services" and "basic health *care* services." Mo. Rev. Stat. §§ 354.010(3) (emphasis added). "Health services" are:

> the health care and services provided by hospitals, or other health care institutions, organizations, associations or groups, and by doctors of medicine, osteopathy, dentistry, chiropractic, optometry and podiatry, nursing services, medical appliances, equipment and supplies, *drugs, medicines*, ambulance services, and other therapeutic services and supplies; . . . .

Mo. Rev. Stat. § 354.010(3) (emphasis added). Similarly, state regulations define "health services" as:

> any service or product for which provision for benefits has been made under a health plan, including but not limited to, the health care and services provided by hospitals, or other health care institutions, organizations, associations or groups, and by doctors of medicine, osteopathy, chiropractic, psychiatry, optometry, and podiatry, and shall also include nursing services, preventative health care services, health screening, prenatal care, medical appliances, equipment and supplies, *drugs, medicines*, ambulance services, mental health services, supplemental services, and other therapeutic services and supplies, and laboratory analysis, physical examinations, the rendering of assistance to physicians, and services for drugs and alcohol abuse, physiotherapy, anesthesiology, and anesthesia . . . .

20 Mo. Code Regs. § 400.2.065(1)(E).

Health care services are not defined with as broad a brush. "Health care services" are "any services included in the furnishing to any individual of medical or dental care or hospitalization, or incident to the furnishing of such care or hospitalization, as well as the furnishing to any person of any and all other services for the purpose of preventing, alleviating, curing, or healing human illness, injury, or physical disability . . . ." Mo. Rev. Stat. § 354.400(9). "Basic health care services" are "health care services which an enrolled population might reasonably require in order to be maintained in good health, including, as

a minimum, emergency care, inpatient hospital and physician care, and outpatient medical services . . . ."  Id. at 354.400(1).  Both sections 354.010 and 354.400 are in Chapter 354; both are titled "Definitions."

The only context in which the term "basic health care services" appears in the State regulations is the cap on copayments in a calendar year.  See 20 Mo. Code Regs. § 400-7.100.[4]  This cap is in the Chapter on HMOs.

The State and federal regulations on copayment caps are identical with one exception. The difference lies in the definitions.  Supporting the federal regulation is the statute expressly defining the term used in that regulation, "basic health services."  See 42 U.S.C. § 300e-1(1). This definition is clearly inclusive – the phrase "[t]he term 'basic health services' means" is followed by eight categories, each with the word "services" in their description.  Had 20 C.F.R. § 417.201(d) not expressly excluded drugs, the plain wording of the statute would still foster no confusion about their exclusion.

There is no such clarity in Missouri's regulation.  The copayment regulation uses a term, "basic health services," that does not appear in the statutes or elsewhere in the regulations.  "Health services" are defined by statute, and the definition would include drugs. "Basic health care services" are defined by statute; the definition is silent as to drugs.  The Plan also uses the term "Health Services," providing that a copayment "for a single Health Service will not exceed fifty percent (50%) of the Plan's cost of providing that single Health Service, nor in the aggregate more than twenty percent (20%) of the total cost of providing

---

[4]This cap and context also appear in the regulations on the State HMO.  See 13 Mo. Code Regs. § 70-15.090, 22 Mo. Code Regs. § 10-2.064

all Basic Health Services." The Plan's definition of "Health Services" is described as being a minimum definition, neither excluding nor including drugs. It is undisputed that outpatient prescription drugs must be dispensed by a state-licensed pharmacist.

It is also undisputed that the Plan is an insurance policy. See **Express Scripts, Inc. v. Wenzel**, 262 F.3d 829, 834 (8th Cir. 2001) ("Under Missouri statutes HMOs are included within the definition of 'insurer' and are treated similarly to insurance companies"). It is well established that if a term in an insurance policy is susceptible of two possible interpretations, one giving rise to coverage and the other not, the term will be construed against the insurer. **Macheca Transport Co. v. Philadelphia Indem. Co.**, 463 F.3d 827, 832 (8th Cir. 2006) (applying Missouri law); **Mo. Public Entity Risk Mgt. Fund v. Investors Ins. Co. of Am.**, 451 F.3d 925, 927-28 (8th Cir. 2006) (same); **Freeman v. State Farm Mut. Auto. Ins. Co.**, 436 F.3d 1033, 1035 (8th Cir. 2006) (same). State regulation and the Plan place a 50% cap on copays for "health services." The Plan does not exclude prescription drugs from the definition of "health services"; Missouri statute includes them. The ambiguity created by the Plan's failure to clearly define "health services" to exclude drugs and the State's act in defining "health services" to clearly include drugs must be resolved in favor of the insured, Vermiglio.

The exclusion of "prescription drugs" in the federal regulation does not cure the ambiguity. As noted, Missouri statute, unlike the federal statute, does not define "basic health services." The federal statute, unlike the Missouri statute, defines "basic health services" to clearly exclude any but the eight categories of services, none of which are drugs or the dispensing of them. GHP chose to use the term "health services" in its Plan and not the term "basic health services."

Citing **Auer v. Robbins**, 519 U.S. 452 (1997), GHP also argues that MDI's conclusion that the regulatory copayment cap does not apply to prescription drugs is entitled to deference. The question in <u>Auer</u> was whether police officers were entitled to overtime under the Fair Labor Standards Act, 29 U.S.C. § 207(a)(1). They were not entitled if they came within an exemption provision for "executive, administrative, or professional employees." **Id.** at 455. The Secretary of Labor used a salary-basis test when considering whether an employee was exempt under this provision. **Id.** The Supreme Court held that the Secretary's approach must be sustained if it was "based on a permissible construction of the statute" and if Congress had "not directly spoken to the precise question." **Id.** at 457.

An HMO is supervised in Missouri by the Missouri Department of Insurance ("MDI"). **Express Scripts, Inc.**, 262 F.3d at 834 (citing Mo. Rev. Stat. §§ 354.485, 374.010). "MDI has not definitively determined that Prescription Drug Coverage is part of basic health care . . . ."[5] (Def. Ex. 3; Pls. Ex. 2.) Thus, unlike in **Auer** when the Secretary of Labor had issued a regulation which spoke to the precise issue before the Court, the MDI has expressly *not* spoken to the issue before this Court.

Imposition of Copayments. The Missouri copayment regulation is also at the heart of the parties' next dispute. The regulation provides, in relevant part, that "[a]n HMO may not impose copayment charges that exceed fifty percent (50%) of the total cost of providing any

---

[5]The correspondence cited by GHP is from an MDI industry analyst and focuses on the question whether GHP can charge a deductible for prescription drugs. Because MDI had *not* decided whether prescription drugs were part of basic health care and because MDI encouraged HMOs to make prescription drug coverage available, the analyst concluded that GHP could impose a deductible. (Def. Ex. 3.)

- 10 -

single service to its enrollees . . . ." 20 Mo. Code Regs. § 400-7.100. As noted by the parties, their disagreement is about the timing of the charges.

GHP argues that its method of quarterly reviewing a member's copayments and refunding any amount in excess of 50% is approved by the MDI and that such approval must be given deference. Submitted in support of this argument are letters from GHP to MDI. In July 2003, GHP and Coventry Health Care of Kansas, Inc. ("Coventry") jointly wrote that their HMOs tracked compliance with the 50% rule on a quarterly basis. (Def. Ex. D at 2.) In October 2004, Coventry and GHP jointly wrote that Coventry was conducting a review on the 50% requirement on a monthly basis; GHP was conducting it quarterly. (Def. Ex. E at 2, 6.) GHP entered into a Stipulation of Settlement with MDI in December 2005. (Id. Ex. F.) Only two pages of this Stipulation have been submitted. On page two, it is noted that GHP was cited for not having a system in place for tracking payments to ensure that (a) a member did not pay more than 50% of the cost of a service, (b) the total copayment charges did not exceed 20% of the total cost of providing all basic health services, and (c) no member paid copayments for basic health care services that totaled 200% of the total annual premium. (Id. at 2.)

GHP portrays MDI's apparent silence in face of the implementation of its quarterly tracking system as approval of that system.

An agency's interpretation of its own regulation is entitled to deference if consistent and not arbitrary, capricious, or contradictory to the plain meaning of the regulation. **St. Marys Hosp. of Rochester, Minn. v. Leavitt**, 535 F.3d 802, 806 (8th Cir. 2008); accord **In re Old Fashioned Enters., Inc.**, 236 F.3d 422, 425 (8th Cir. 2001). Additionally, "an

agency's interpretation which is not subject to the rigors of notice and comment is not entitled to substantial deference." **Id.** (internal quotations omitted).  See also **Clark v. U.S. Dep't of Agric.**, 537 F.3d 934, 940 (8th Cir. 2008) (An agency's interpretation of a term that "is not contained in a regulation born of the rulemaking process" and "does not appear to have the force of law" is not entitled to deference.) (internal quotations omitted).  When reviewing an agency's interpretation, "a court must determine 'whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case.'" **In re Old Fashioned Enters., Inc.**, 236 F.3d at 426 (quoting Robinson v. Shell Oil Co., 519 U.S. 337, 340 (1997)).

Contrary to GHP's position, the language at issue is "may not impose," not simply "impose."  The interpret this language, in the absence of MDI's interpretation,[6] the Court may refer to dictionaries.  See **City of Jefferson City, Mo. v. Cingular Wireless, LLC**, 531 F.3d 595, 606 (8th Cir. 2008).  Accord **Schumacher v. Cargill Meat Solutions Corp.**, 515 F.3d 867, 871 (8th Cir. 2008) ("This court often turns to a commonly used dictionary to ascertain a word's ordinary meaning.").

"Webster defines 'impose' to mean, 'to make, frame, or apply as compulsory . . . .'" **CM, Inc. v. Canadian Indem. Co.**, 635 F.2d 703, 708 (8th Cir. 1980) (quoting Webster's New Third International Dictionary 1136 (1966)).  The Oxford English Dictionary defines "impose" as "[t]o lay on, as something to be borne, endured, or submitted to; to inflict

---

[6]MDI's silent acquiescence to GHP's tracking system is clearly not an interpretation of whether its 50% regulation permits excess copayments to be reimbursed as opposed to not being made at the point of service.

- 12 -

(something) on or upon; to levy or enforce authoritatively or arbitrarily." Oxford English Dictionary, http://dictionary.oed.com/cgi/entry/50113247?query_type=word&queryword= impose (last visited Sept. 23, 2008).  When used as an adverb, as in "may not impose," "not" is "[t]he ordinary verb of negation," i.e., "a denial of something."  Id., http://dictionary.oed. com/cgi/entry/00322542?single=1&query_type=word&queryword=not; http://dictionary.oed. com/cgi/entry/00322542?single=1&query_type=word&queryword=negation. Thus, the plain meaning of "may not impose" is that one is prohibited from inflicting or applying something.

Title 20 Mo. Code Regs. § 400-7.100 mandates that "[a]n HMO may not impose" a copayment charge that exceeds 50% of the total cost of a single service.  Sometimes, GHP does.  That it later refunds any excess does not negate that it did not impose it in the first instance.  The difference between not imposing something in the first instance and refunding what should not have been charged in the second instance is illustrated by the testimony of a GHP representative, Geneva Clark, that a refund to a member that is returned is then sent to the State.  In such instance, the Plan member would have had to make a copayment greater than 50% because the member never received the refund.  There is no qualification in the regulation that the 50% cap only applies if a refund is able to be made.

Nor does any difficulty in implementing the regulation confer a different meaning than the one made plain by the language of the regulation.[7]  The proper course to remedy the difficulty, other than resolve it, is to urge MDI to adopt a regulation allowing for a refund

---

[7]The Court notes that according to an exhibit submitted by GHP, Coventry is able to make the excess determination within a month.  Thus, Coventry's computers are able to do something GHP's computers are not.  Regardless, there is no leeway in the regulation to accommodate an HMO's compliance difficulties.

- 13 -

within a certain period of any excess copayment. The regulation as it is does not provide for such practice.

The parties also disagree about the provision in § 400-7.100 that an HMO "may not impose" copayment charges "in the aggregate more than twenty percent (20%) of the total cost of providing all basic health services." 20 Mo. Code Regs. § 400-7.100. GHP refunds copayments in excess of the 20% rule on an annual basis. Although both parties briefly raise this issue, the majority of each's memorandums are focused on the question of the 50% copayment cap. The Court finds that neither party has satisfied their summary judgment burden respective to the 20% cap.

## Conclusion

For the reasons set forth above, the Court finds that the 50% copayment cap applies under the Missouri regulation to GHP's prescription drug rider and that this cap applies at the point of service. The Court declines to make a finding on the record and arguments before it as to 20% aggregate copayment cap. Accordingly,

**IT IS HEREBY ORDERED** that the motions of Lisa M. Vermiglio and Theresa Andrews for partial summary judgment [Docs. 47, 77] are **GRANTED** in part and **DENIED** in part as set forth above.

**IT IS FURTHER ORDERED** that the motions of Group Health Plan, Inc., for partial summary judgment are **DENIED**. [Docs. 48, 91]

**IT IS FURTHER ORDERED** that the motion of Group Health Plan, Inc., to strike certain evidence in Plaintiffs' reply and the motion of Plaintiffs for leave to file supplemental authority are each **DENIED**.[8]  [Docs. 73, 80]

**IT IS FINALLY ORDERED** that the motion of Plaintiffs for class certification is **DENIED** without prejudice to it being refiled in the context of the current rulings.  [Doc. 87]

/s/ Thomas C. Mummert, III
THOMAS C. MUMMERT, III
UNITED STATES MAGISTRATE JUDGE

Dated this 24th day of September, 2008.

---

[8]GHP submitted evidence relating to Coventry while denying the applicability of other evidence relating to Coventry when submitted by Plaintiffs.  Plaintiffs submit evidence relating to another HMO.  In ruling on the motions for summary judgment, the Court considered only that evidence that would be admissible at trial.  See **Cherry v. Ritenour School Dist.**, 361 F.3d 474, 480 (8th Cir. 2004).